

FILED & ENTERED

JUN 27 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY wesley    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

In re:

CLARK WARREN BAKER,

                                    Debtor(s).

_____

JAMES MURTAGH, M.D.,

                                    Plaintiff(s),

    v.

CLARK WARREN BAKER,

                                    Defendant(s).

CHAPTER 7

Case No.: 2:15-bk-20351-BB
Adv No:  2:15-ap-01535-BB

**REPORT AND RECOMMENDATION TO DISTRICT COURT FOR WITHDRAWAL OF REFERENCE AS TO DETERMINATION OF CRIMINAL CONTEMPT**

Date:       June 11, 2019
Time:       10:00 AM
Courtroom: 1539

Because criminal contempt matters under 18 U.S.C. § 401(3) and Rule 42 of the Federal Rules of Criminal Procedure must be tried by the District Court, rather than the Bankruptcy Court, see In re Dyer, 322 F.3d 1178 (9th Cir. 2003), and because this Court

1  believes that the facts of this case warrant consideration of prosecution for criminal

2  contempt, the Court hereby recommends that the District Court *sua sponte* withdraw the

3  reference with respect to all criminal and civil contempt matters in this bankruptcy case

4  pursuant to 28 U.S.C. § 157(d) for the limited purpose of considering criminal contempt

5  proceedings against defendant Clark Warren Baker ("Baker").

6                                            I

7                         **PROCEDURAL HISTORY**

8      **A.  Litigation in State Court**

9          On November 15, 2013, James Murtagh, M.D. ("Murtagh") filed a lawsuit against

10  Baker in Los Angeles Superior Court, commencing case no. BC 527716 (the "State

11  Court Action").  In the third amended version of his complaint in the State Court Action,

12  filed February 18, 2015, Murtagh alleged, among other things, that Baker had

13  committed intentional infliction of emotional distress, defamation, intentional interference

14  with contractual relations and intentional interference with prospective economic

15  advantage.  In his prayer for relief, Murtagh requested compensatory damages,

16  estimated at not less than $ 5 million, exemplary or punitive damages and injunctive and

17  declaratory relief.

18          On May 12, 2015, the Los Angeles Superior Court, in the State Court Action,

19  ordered Baker to pay $60,000 in sanctions to reimburse Murtagh for attorneys' fees and

20  costs attributable to a frivolous motion that Baker had filed in the State Court Action.

21  Baker never paid these sanctions and instead filed a chapter 7 bankruptcy petition in

22  the United States Bankruptcy Court for the Central District of California on June 29,

23  2015, commencing bankruptcy case no. 2:15-bk-20351 (the "Case").  The State Court

24  Action has remained stayed since that date.

25      **B.  Litigation in Bankruptcy Court**

26          On October 5, 2015, Murtagh commenced the above-entitled adversary

27  proceeding against Baker in the Case (the "Action").  Murtagh's Second Amended

28  Complaint, filed December 29, 2015, seeks to have Murtagh's claims against Baker

1  excepted from any discharge that Baker might receive in the Case under Bankruptcy

2  Code section 523(a)(6).[1] According to the Second Amended Complaint [Docket No.

3  16[2]], attached as Exhibit 1 hereto, the original conflict between Murtagh and Baker

4  arose from their opposing views regarding the treatment of patients infected with HIV:

5        a.  Baker is an "AIDS denier" who: (i) disputes widely accepted medical and

6             scientific evidence that HIV causes AIDS; (ii) through OMSJ[3], brokered

7             experts in litigation to discredit test results which resulted in HIV-positive

8             findings; and (iii) encourages HIV-positive individuals to stop taking

9             medically prescribed pharmaceutical treatment based on advocacy that

10             AIDS is just a hoax orchestrated by "Big Pharma" (which advocacy has

11             resulted in many unnecessary or more accelerated deaths).

12        b.  Dr. Murtagh is an experienced licensed physician with three board

13             certifications (Internal Medicine, Pulmonary Disease and Sleep Medicine),

14             and is a former professor at Emory University's Medical School; Dr.

15             Murtagh disputes Baker's baseless theories about HIV testing and AIDS;

16             (ii) supports medical treatment for HIV and AIDS patients; and (iii) believes

17             that medication for the prevention, postponement and/or treatment of

18             AIDS has been proven to be effective.

19  Second Amended Complaint, p. 2 at lines 5-18.

20      Murtagh's Second Amended Complaint offers the following description of Baker's

21  willful and malicious conduct toward him:

22

23

24

25  [1] Bankruptcy Code section 523(a)(6) excepts from the discharge that an individual debtor may receive any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

26  [2] Unless otherwise noted, all docket numbers used in this Report and Recommendation refer to docket numbers in the Action.

27  [3] According to the Second Amended Complaint at ¶ 5, OMSJ (the "Office of Medical & Scientific Justice, Inc.") is a private investigation company that claims to be a nonprofit corporation whose stated mission is to "defend victims

28  of scientific and medical abuse." OMSJ filed bankruptcy on June 29, 2015 – the same day that Baker filed bankruptcy – using the same attorney that represented Baker in filing bankruptcy. OMSJ used Baker's home address as its business address on its petition, and Baker signed OMSJ's petition as its president.

7.  In an effort to gain prominence in the AIDS-denialist community and obtain personal financial gain (including an admitted payment to OMSJ of at least $1.2 million from one AIDS denialist), Baker orchestrated a scorched earth campaign against Dr. Murtagh in which Baker sought to: (a) discredit Dr. Murtagh; (b) destroy Dr. Murtagh's professional and personal reputation; and (c) render Dr. Murtagh unemployable and demoralized (as reflected in Baker's emails taunting Dr. Murtagh to commit suicide).

8.  Baker's relentless campaign against Dr. Murtagh began in 2008, continued through filing of the Baker Bankruptcy Case on June 29, 2015 and even continues post-bankruptcy. As part of Baker's effort to ruin Dr. Murtagh financially and personally, Baker fabricated and disseminated outright lies and innuendo about Dr. Murtagh such as: (a) by publishing them on websites owned and/or created by Baker about Dr. Murtagh; and (b) by communicating those lies and innuendo directly to Dr. Murtagh's employers and recruiters, both verbally and in writing.

9.  In addition to manufacturing false and disparaging material about Dr. Murtagh, Baker improperly obtained Dr. Murtagh's private information, tracked Dr. Murtagh's location and employment and used that private information to contact Dr. Murtagh's current and prospective employers and recruiters; Baker shared the false damaging material with others to advance Baker's plan to get Dr. Murtagh terminated from his then current employment and/or to be disqualified from future employment.

* * * *

11. Sometime in 2012, Baker created, owned and maintained a website named www.jamesmurtaghmd.com, which Baker so named in an effort to deceive readers into believing that Dr. Murtagh had authorized the website. Baker used the website to: (i) post inaccurate and disparaging information about Dr. Murtagh; and (ii) improperly direct traffic to Baker's commercial site (omsj.com), by among other things, advertising a "confidential consultation" with Baker.  Dr. Murtagh was forced to bring a formal proceeding before the World Internet Property Organization ("WIPO") -- Murtagh. v. Baker et al., WIPO Case No. D2014-071 -- to protect Dr. Murtagh's professional and personal reputation. Baker defended his claim to the website but Dr. Murtagh prevailed in that, on or about June 26, 2014, WIPO issued a decision finding that Baker acted in bad faith, with a specific intent to confuse and deceive the public, and the WIPO ordered Baker to transfer the disputed domain name to Dr. Murtagh.

* * * *

12. After losing the right to use the domain name www.jamesmurtaghmd.com, Baker simply moved the content from www.jamesmurtaghmd.com to new sites which Baker created and maintained, including www.jamesmurtaghmdtruth.com and www.jamesmurtaghmdpsycho.com, for the express purpose of publishing the

same and additional false and disparaging information about Dr. Murtagh. Baker used the pejorative term "psycho" in the website name to: (i)falsely suggest that Dr. Murtagh has a mental, personality and/or character defect which would render him unfit to work with patients; and (ii) with the intent to inflict reputational and economic harm upon Dr. Murtagh.

13.  In addition to using confusingly named websites, Baker published false disparaging information about Dr. Murtagh in other online venues, including www.omsj.org, www.cwbpi.com and www.propagandists.org.

* * * *

18.    In addition to disseminating and publishing defamatory content about Dr. Murtagh in writing, and in an effort to cause harm to Dr. Murtagh, Baker regularly communicated, both verbally and in writing, with: (i) numerous recruiters with whom Dr. Murtagh has developed business relationships; and (ii) various hospitals at which Dr. Murtagh was then working and from which Dr. Murtagh was regularly asked to leave promptly after contact with Baker and/or the websites, usually without explanation and despite otherwise positive reviews.

19.    On June 28, 2014, Baker sent an anonymous email from drm@nym.hush.com to many medical recruiters, including GMedical, one of Mr. Murtagh's recruitment agencies. The email, which included a link to www.jamesmurtaghmd.corn, the website which was then controlled by Baker and contained false information about Dr. Murtagh. By sending the email, Baker intended to convince the recruiting agencies to cancel, not honor and/or not renew Dr. Murtagh's contract with the agency. The email stated:

first name: James [¶] last name: Murtagh [¶] email: drm@nym.hush.com [¶] country: United States [¶] specialty: [¶] question:  FYI -- James John Murtagh MD is a Georgia physician who shakes down hospitals and clinics throughout the United States. Shortly after he finds an employer, he causes a problem and sues hoping to get a. $10,000 - $200K settlement. He records all telephone conversations and uses them to sue recruiting companies and recruiters. He may try to find jobs through your agency.  For more information about his behavior and court cases, visit www.jamesmurtaghmd.com.

20.    Baker hacked into www.internationalwhistleblower.org, a website owned by Dr. Murtagh.  Dr. Murtagh took down the website after he discovered Baker's hack which involved Baker's insertion of an unauthorized and defamatory page on the site. The unauthorized page included a reference to Dr. Murtagh's alleged, involvement in gay porn and a link to www.jamesmurtaghmd.com, the website created and controlled by Baker at the time. Baker's unauthorized post was intended to cause professional and personal harm to Dr. Murtagh.

* * * *

22.    On November 1. 6. 2012, Baker emailed Dr. Murtagh: "Every message I receive from you reminds me that I have a life and you don't. I have

more time now that hospital recruiters no longer call me as much as they did .....
Now that your medical career is finally over, will you work at McDonalds or hang
yourself in a closet?"

23.    On. November 19, 2012, Baker emailed Dr. Murtagh: "Dear Mo: I've
received a lot of email and phone calls lately - from former lawyers, healthcare
recruiters, hospitals. . . it looks like your behavior is finally catching up with you.
With no job, no family, no children, no prospects and no future, I pray that
someone won't find you hanging from a belt in a motel closet this Christmas. I
want you alive so that I can depose you on videotape.  You're the most
fascinating sociopath I've ever met. ¶ You can probably find work somewhere
that doesn't require you to interact with other people, delivering papers or maybe
as a long haul truck drive. ¶ In 2008, I warned you and your associates that the
storm would come. That storm has come."

\* \* \* \*

25.  On November 24, 2014, Baker emailed Dr. Murtagh: "Dear Mo . . . I
see that your medical recruiters, clinics and hospitals regularly visit your website.
They spend a few minutes there, click on links that describe your mental
problems, and leave.  The clock is ticking, your career is circling the drain, and
the holiday seaon will be a very dark and empty place for you and yours – oh
wait – you don't have anyone do you.  I forgot.
http://www.jamesmurtatghmdtruth.com/. Happy Thanksgiving, to the biggest
turkey I know.  Clark Baker (LAPD ret)"

Second Amended Complaint, pp. 2-8.

After extended litigation about the form of the pleadings and the viability of
Baker's cross-complaint (which the Court dismissed), as well as a failed mediation,
plaintiff began to encounter problems in conducting discovery.  These problems have
led this Court (i) to make two criminal referrals to the United States Attorney concerning
Baker's conduct in the Action; (ii) to make numerous findings about Baker's failure to
comply with orders of this Court; (iii) to strike Baker's answer to complaint and authorize
plaintiff to proceed by way of default; and (iv) to hold Baker in civil contempt and have
him arrested in an effort to obtain compliance with its orders.  To date, none of these
efforts has had the effect of deterring Baker from engaging in misconduct in the Action.

When a party cannot be cajoled or coerced into complying with court orders, civil
contempt is not an effective tool.  Such a party should be held in criminal contempt and
punished for his wrongdoing.  The Bankruptcy Court lacks the authority to take this

action and therefore recommends that the District Court withdraw the reference to the extent necessary to permit it to do so.

### 1. The First Criminal Referral

Plaintiff's efforts to obtain testimony from a witness known as David Bender or Kevin Kuritsky ("Bender") led the Court to make its first criminal referral concerning the conduct of defendant Baker in the Action.  In or about October of 2014, Bender, who resides in Baltimore, Maryland, had provided Baker with a declaration that he had used in connection with a motion Baker had filed in the State Court Action (the "2014 Declaration").  According to a declaration filed by Lisa Hiraide[4], one of the attorneys for Murtagh in the Action, when she contacted Bender by telephone in September of 2015 to ask him about the contents of the 2014 Declaration, Bender advised her that nothing contained in the 2014 Declaration had been true and that he had only provided testimony that was damaging to Murtagh because he had been "totally pressured" and "extorted" by Baker into signing the declaration in exchange for Baker's agreement to remove all embarrassing and damaging materials that Baker had posted about Bender on the internet.

Baker conducted a deposition of Bender in the Action in Los Angeles on or about June 6, 2016, but Bender had insisted on leaving the deposition (at approximately 1:55 p.m. that day) before he could be cross-examined by counsel for Murtagh.  [See Declaration of John Wallace, Exhibit 3, to plaintiff's September 20, 2016 motion for a protective order [Docket No. 152].]  Through discovery, Murtagh located a copy of an email exchange between Bender and counsel for Baker in which Bender advised Baker's counsel that he would only be willing to come to Los Angeles to be deposed by Baker if he could leave immediately after Baker's questions and not be cross-examined by counsel for Murtagh. Id. at ¶ 4.

---

[4] See Declaration of Lisa Hiraide, Exhibit 4 to a September 20, 2016 motion by plaintiff for a protective order [Docket No. 152].

Based on this information, Murtagh filed a motion [Docket No. 154] to have Baker's answer to the Second Amended Complaint stricken or, at a minimum, to have Bender's testimony excluded at trial.  The Court reached Bender by telephone on the record during the course of the November 15, 2016 hearing on this motion and obtained Mr. Bender's consent to come to Los Angeles for a continued examination on December 12, 2016.  Based on this conversation with Bender and his agreement to appear, the Court entered its November 18, 2016 Interim Order [Docket No. 187] attached hereto as Exhibit 2, which orders Bender to appear in the offices of plaintiff's counsel on December 12, 2016 at 10:00 a.m. and schedules a continued hearing on plaintiff's motion for January 10, 2017.

On December 7, 2016, Bender sent a fax to chambers [Docket No. 189, attached as Exhibit 3 hereto], advising that he would not be appearing for his December 12, 2016 deposition because he had received inadequate notice of the need to travel across the country.  Attached to this fax were copies of emails he had exchanged with counsel for the parties complaining about not having received adequate notice of the need to appear in Los Angeles for this deposition.  At approximately the same time, however, Bender telephoned Judge Bluebond's law clerk, Jennifer Wolfberg, and advised her that the real reason he would not be appearing for his December 12 deposition was that he was afraid of Baker and what Baker had threatened to do if he gave truthful testimony at the continued deposition.  He therefore did not appear at his continued deposition on December 12, 2016.

The Court related the substance of Ms. Wolfberg's December 7, 2016 conversation with Bender to the parties at the continued hearing held January 10, 2017, and found that, in light of Bender's refusal to submit to an examination by Murtagh and the conflicting stories he had already provided, neither party would be permitted to introduce any testimony from him at trial.  See Docket No. 224,

Exhibit 4 hereto (the "Second Bender Order"), entered March 15, 2017.  The

Court also stated in the Second Bender Order that it would "make a referral to

the appropriate law enforcement authorities to investigate whether criminal

conduct has occurred with regard to the witness" and set a briefing schedule and

a continued hearing for March 14, 2017 on whether monetary sanctions should

be imposed on Baker and his counsel based on this conduct.  A copy of the

referral referenced in the Second Bender Order, docket No. 200, is attached

hereto as Exhibit 5.

At the continued hearing held March 14, 2017, the Court imposed

monetary sanctions on Baker in the amount of $35,000 to compensate Murtagh

for his reasonable attorneys' fees and expenses in connection with the

preparation and prosecution of the motion that led to the exclusion of Bender's

testimony.  See Final Bender Order, Docket No. 229, attached as Exhibit 6

hereto.  Counsel for Baker filed a notice of compliance on April 26, 2017 [Docket

No. 248] in which he reports that these sanctions were paid on April 20, 2017,[5]

but this "witness tampering" incident was merely the first of the problems that the

Court encountered as a result of Baker's misconduct in connection with the

discovery process.

## 2. Attempts to Obtain Equal Access to Electronic Data

As Baker had denied being responsible for certain of the defamatory and

harassing material directed at Murtagh, both parties retained computer experts to

assist them in the Action.  Plaintiff employed an expert named Bruce Anderson,

and defendant employed an expert named James Pickrell.  Mr. Pickrell filed an

expert witness report with the Court on May 15, 2017 as docket no. 252 and a

supplemental expert report on June 19, 2017 as docket no. 268.  (The Court

---

[5] Unfortunately, this story did not end well for Bender.  On December 11, 2017, Bender again wrote to the Court, this time complaining that Baker had once again posted personal and harassing information about him on the internet.  According to Bender, "This has obviously occurred after the submission of your 'Referral of Clark Warren Baker for Investigation for Witness Tampering', docket #200 in the aforementioned case."  A copy of Bender's December 11, 2017 letter, docket no. 310, is attached hereto as Exhibit 7.

1   subsequently found that there was no reason for Baker to have filed these

2   reports at that time and made these filings "private events.")

3       On August 23, 2017, plaintiff moved for a protective order [Docket No.

4   274], asking that his expert be given the same access that Baker's expert had

5   been given in connection with the preparation of his expert reports to two

6   websites, www.Baddocjjm.com and www.jamesmurtaghmdtruth.com, and to

7   Baker's private Hushmail email account(s).  Baker's expert had been given the

8   password or password recovery link necessary to give him access to these

9   websites and any password-protected files, including rights available only to

10  administrators of the sites.  However, when Murtagh's expert asked for the same

11  access, Baruch Cohen, then counsel for Baker, refused and offered instead to

12  meet with plaintiff's expert in Cohen's office and to permit Anderson to review

13  materials on Baker's laptop under the supervision and in the presence of Baker's

14  counsel.  A copy of Murtagh's August 23, 2017 motion for protective order (the

15  "August Motion"), docket no. 274, is attached hereto as Exhibit 8.

16      The Court granted the August Motion by order entered October 5, 2017

17  (the "October 2017 Order"), docket no. 291, a copy of which is attached hereto

18  as Exhibit 9.  In the October 2017 Order, the Court directed Baker within 3

19  business days after entry of the order to "provide Bruce Anderson ('Anderson')

20  . . . the same level of access to the same websites, passwords, domains, email

21  accounts, etc. that Baker provided to his own expert witness James Pickrell

22  ('Pickrell') in the same manner that Baker provided such access to Pickrell."

23      To protect Baker, the October 2017 Order prohibited Anderson from

24  sharing any information obtained pursuant to the October 2017 Order with

25  Murtagh or anyone acting on Murtagh's behalf and directed him to use this

26  information solely for purposes related to his investigation and analysis in this

27  adversary proceeding and/or for the formation of expert opinions in the Action.

28  The October 2017 Order also expressly stated that Anderson could not be

required to conduct his investigation in the presence or under the supervision of Baker or his counsel. As the Court's later findings reflect, Baker never complied with this order.

### 3. **Attempts to Obtain Unredacted Copies (or a Privilege Log) and Documents in Native Electronic Format**

On September 1, 2017, Murtagh filed another discovery motion (the "September 2017 Motion"), docket no. 281, Exhibit 10 hereto, complaining, among other things, that Baker had repeatedly produced redacted versions of documents without providing a privilege log, had concealed and withheld documents such as emails between himself and witnesses Pardo, Brown and Bender, and had produced altered paper copies of emails by cutting and pasting so as to remove actual contents of the documents, making redactions difficult to detect. As a result, Murtagh requested, among other relief, that (i) Baker be ordered to produce "in native, exact electronic form," and not as .pdfs or other *images* of documents that can be altered, all emails that he previously produced or submitted as exhibits, including any that had been previously redacted; (ii) Baker be ordered to provide a privilege log describing any documents that he may withhold on privilege grounds; and (iii) Murtagh be awarded monetary sanctions for the attorneys' fees and costs that he had incurred in bringing and prosecuting the September 2017 Motion.[6]

---

[6] Murtagh filed yet another discovery motion on September 13, 2017 (the "Second September 2017 Motion") -- docket no. 284. (The Court has not attached a copy of this motion as it runs, with exhibits and attachments, approximately 126 pages.) In the Second September 2017 Motion, Murtagh complains, among other things, that (A) Baker supplemented his Rule 26 disclosures with not less than 435 documents after the discovery cutoff, depriving Murtagh of the ability to depose Baker or conduct other discovery concerning these documents; (B) many of the documents are emails sent or received by Baker himself dated as early as 2008, meaning that many of the documents have been in Baker's possession for years and should have been produced earlier; (C) many of the documents concern a subject matter as to which Baker previously stated under penalty of perjury that he had no documents; (D) the contents of these documents refer to other documents that Baker has withheld, although they fall within the scope of prior discovery requests; (E) many of the documents were previously excluded by the Second Bender Order or are documents that Baker was prohibited from retaining by an earlier order of the Los Angeles Superior Court in the State Court Action. Murtagh requests that these documents be excluded and that monetary sanctions be imposed. In response to the Second September 2017 Motion, the Court entered its December 14, 2017 "Order on Plaintiff's Motion for Protective Order re *435* Late Produced Documents, Etc.," Docket No. 312, which provides, among other things, that (A) Baker and his counsel must provide plaintiff with a declaration not later than December

Following a hearing held October 31, 2017 on the September 2017 Motion, the Court granted the forms of relief requested above, among other forms of relief, and imposed monetary sanctions on Baker in the amount of $5,675, payable to plaintiff within 45 days after entry of the Court's order on that Motion. See Order on September 2017 Motion, Docket No. 313, attached hereto as Exhibit 11. These additional sanctions were never paid,[7] and, according to Murtagh, the required privilege log was never provided.[8]

### 4. The April and June 2018 Orders

On February 27, 2018, Murtagh filed a motion seeking to have Baker held in contempt and to have certain findings made and certain sanctions imposed based on Baker's violations of the terms of this Court's October 2017 Order. According to that motion, Baker violated the terms of the October 2017 Order by failing to give plaintiff's expert, Bruce Anderson, the required level of access to Baker's Hushmail email accounts and to the websites www.Baddocjjm.com and www.jamesmurtaghmdtruth.com (jointly, the "Two Websites").

The order entered in response to that motion (the "April 2018 Order") [Docket No. 339], attached as Exhibit 12 hereto, identifies the respects in which Baker failed to comply with the October 2017 Order and sets a hearing and a briefing schedule on an order to show cause why Baker should not be held in contempt and the sanctions requested by plaintiff should not be imposed. The Court conducted a hearing on the April 2018 Order on May 8, 2019 at 2:00 p.m.

At the May 8 hearing, the Court expressed concern that it might be inappropriate for the Court to hold Baker in contempt and impose some or all of

---

11, 2017 in which they explain, as to the 435 late produced documents, why the document was not previously produced; (B) Baker must produce certain documents discussed on the record at the hearing on the Second September 2017 Motion in native electronic format without redactions, without the removal of metadata and without removing or altering information that is embedded in the document that reflects if and when the document was altered and by whom; and (C) plaintiff shall have a period of 90 days after Baker has produced the foregoing documents in native electronic format and the required declarations to propound additional discovery concerning any issues raised by the newly produced documents.

[7] See Declaration of Robert Rosen, Esq. in Support of Plaintiff's Status Report, Docket No. 400, at p. 13, par. 23(b).

[8] See id. at p. 11, par. 19(b).

the sanctions requested by Murtagh's February 27, 2018 motion because the April 2018 Order did not itself contain sufficient detail to apprise Baker of the possible sanctions to be imposed.[9]  The Court therefore scheduled a further hearing on Murtagh's requests for relief for August 16, 2018 at 10:00 a.m., set a briefing schedule for that hearing and issued a more detailed order to show cause -- the "June 2018 Order," docket no. 361, a copy of which is attached hereto as Exhibit 13 hereto.

In the June 2018 Order, the Court, among other things:

a. Directed Baker to show cause why the Court should not make a series of findings (collectively, the "First Findings") including the following:

i. That Baker had reduced the amount of the data stored in his Hushmail email account from 155 MB of data to 9 MB of data (the "Data Reduction") after the Court issued the October 2017 Order, which required Baker to provide plaintiff's expert with the same access to data that Baker had given to his own expert;

ii. That the Data Reduction was purposeful and intentional and not the result of Baker's simply removing a few spam emails;

iii. That Baker had deleted "subaccounts" from his Hushmail email account after the Court issued the October 2017 Order;

iv. That, after having been ordered in the April 2018 Order to provide Anderson with all Hushmail emails that had been in his Hushmail email accounts at any time during the 10 years prior to the entry of the April 2018 Order, Baker failed to

---

[9] See Local Bankruptcy Rule 9020-1, requiring that a proposed order to show cause why someone should not be held in contempt should, among other things, identify clearly the allegedly contemptuous conduct (and not just by reference to the content of the motion) and the possible sanctions that the Court may impose at the hearing.

restore the data and subaccounts necessary to comply with the April 2018 Order;

v.    That, after providing access information to Anderson concerning certain websites referenced in the October 2017 Order, Baker changed the username and/or password for these websites to prevent Anderson from actually obtaining the access that Baker had been ordered to provide; and

vi.    That, notwithstanding Baker's having repeatedly denied that he had anything to do with the website www.Baddocjj.com, (A) Baker's cooperation and assistance were essential to setting up that website and (B) Baker maintains an ongoing connection to that website; and

b.  Ordered Baker to show cause why, based on the above proposed findings, the Court should not, among other things:

i.    Hold Baker in civil contempt and impose additional monetary sanctions to reimburse plaintiff for attorneys' fees incurred in attempting to obtain compliance with orders of the Court;

ii.    Refer Baker to the United States Attorney for criminal prosecution for the Data Reduction;

iii.    Issue a report and recommendation to the District Court that Baker be held in criminal contempt and incarcerated for a period of not less than 90 days as punishment for his failure to comply with court orders;

iv.    Enter an order appointing a neutral expert pursuant to Fed. R. Evid. 706 (the "Neutral Expert") to preserve evidence and undertake related activities and directing Baker and his counsel to cooperate with the Neutral Expert by, among other things, sending a specified form of letter to a list of

1    vendors and witnesses directing them to take certain

2    actions;

3         v.   Impose additional monetary sanctions; and/or

4         vi.  Prohibit Baker from raising, contesting or offering evidence

5              or argument to dispute a list of issues in the Action set forth

6              in paragraph 12 of the June 2018 Order (collectively, the

7              "Resolved Issues");

8    c.  Ordered Baker to preserve and refrain from altering, destroying,

9        overwriting, moving, password-protecting or modifying any of

10       Baker's Data[10] or any device containing Baker's Data; performing

11       any activity that might accidentally and/or intentionally spoliate any

12       of Baker's Data; or changing any access information (including user

13       names, passwords, etc.) or encryption without a prior written Order

14       or prior written stipulation agreed to and signed by Plaintiff's

15       counsel;

16   d.  Required Baker by July 27, 2018 to restore all Baker's Data that

17       had been spoliated since October 5, 2017, including emails deleted

18       from his Hushmail email accounts and any contents removed from

19       the Two Websites, and to produce to plaintiff all data removed as

20       part of the Data Reduction;

21   e.  Required Baker by July 27, 2018 to send a prescribed form of

22       notice (the "Preservation Notice") to a list of vendors and witnesses

23       identified in attachments to the June 2018 order and each

24       administrator, author, contributor, developer, manager and/or

25       owner known to Baker of the Two Websites and the website

26       shakedowndoc.com; and

27

28
_____
[10] The terms "Baker's Data" and "Baker's Devices," among other terms, are defined in Attachment "A" to the June 2018 Order.

f.  Required Baker to file by August 3, 2018 a compliance declaration containing the information outlined in Attachment B to the June 2018 Order (the "Compliance Declaration").

The Court conducted a hearing on the June 2018 Order on August 16, 2018 at 10:00 a.m.  The Court's August 16, 2018 order, docket no. 369, attached hereto as Exhibit 14 (the "August 2018 Order"), memorializes the Court's findings at that hearing, which included the fact that Baker had failed to:

a.  file a written response to the June 2018 Order and had therefore waived any opposition to the relief requested;

b.  file the required Compliance Declaration;[11]

c.  send the required Preservation Notice to third parties;[12] and

d.  provide any information concerning steps that he had taken in an effort to restore deleted data.

In light of the foregoing, in its August 2018 Order, the Court (a) made the First Findings; (b) prohibited Baker from challenging the Resolved Issues; (c) set a hearing for September 27, 2018 at 10:00 a.m. and a briefing schedule for it to determine the amount of the monetary sanctions to impose upon Baker; (d) stated that it would enter a separate ordering appointing a Neutral Expert; and (e) set a continued hearing for September 27, 2018 at 10:00 a.m. to consider the following issues (collectively, the "Continued Matters")[13]:

---

[11] Baker filed declarations on April 13, 2018 (docket no. 228) and June 13, 2018 (docket no. 356), but these declarations did not satisfy the requirements of the June 2018 Order for the reasons set forth in paragraph 3 of the August 2018 Order.

[12] Baker claims to have mailed letters on June 1, June 6 and June 28, 2018, but these letters did not satisfy the requirements of the June 2018 Order for the reasons set forth in paragraph 4 of the August 2018 Order.

[13] The penultimate paragraph of the August 2018 Order clarifies that the September 27, 2018 hearing would be only a "holding date" with regard to the Continued Matters and that the Court would set a further briefing schedule and hearing date on the Continued Matters once it received and reviewed the report of the Neutral Expert.

    i.    Whether the Court should hold Baker in civil contempt and issue additional orders intended to compel compliance with its orders;

    ii.    Whether the Court should refer Baker to the United States Attorney for criminal prosecution for the Data Reduction; and/or

    iii.    Whether the Court should issue a report and recommendation to the District Court that Baker be held in criminal contempt and incarcerated for a period of not less than 90 days as punishment for his failure to comply with court orders.

Following the September 27, 2018 hearing, the Court entered its September 28, 2018 order [Docket No. 393], a copy of which is attached hereto as Exhibit 15.  That order imposed monetary sanctions on Baker in the amount of $133,319.71 due and payable within 30 days after entry of that order and set a continued status conference/holding date on the Continued Matters for December 11, 2018 at 2:00 p.m.  (That hearing was later continued by stipulation between the parties to January 8, 2019 at 2:00 p.m.)

**5.  The Neutral Expert's Reports**

On September 6, 2018, the Court entered its Order Appointing Neutral Expert [Docket No. 380], a copy of which is attached as Exhibit 16 hereto (the "Neutral Expert Order").  The Neutral Expert Order outlines the duties of the Neutral Expert and requires, among other things, that Baker:

    a.    deliver all of Baker's Devices[14] to the Neutral Expert;

    b.    provide the Neutral Expert with the information necessary to access the data on Baker's Devices[15]; and

---

[14] Capitalized terms used in the Neutral Expert Order have the meanings set forth in Attachment B to that order.
[15] See supra note 14.

1          c.      reimburse plaintiff for all amounts that he pays as fees and

2                   expenses of the Neutral Expert within 5 days after proof of

3                   payment is sent to Baker's counsel.[16]

4     Neil Broom of Technical Resource Center, Inc. accepted the appointment as

5     Neutral Expert by filing the required Notice of Acceptance by Neutral Expert with

6     the Court on September 10, 2018 [Docket No. 383] and filed status reports with

7     the Court on December 4, 2018 [Docket No. 395] (the "First NE Report"),

8     attached as Exhibit 17 hereto, and January 8, 2019 [Docket No. 403] (the

9     "Second NE Report"), attached as Exhibit 18 hereto.

10          In the First NE Report, Broom explains that he contacted Baker's then

11    counsel, Baruch Cohen, on September 7, 2018 to make arrangements for Baker

12    to deliver the Baker Devices to the Neutral Expert.[17]  Broom reports that he went

13    to Baker's home at 9:00 p.m. on September 18, 2018 and collected 8 different

14    devices from Baker for forensic processing in his lab.[18]  Broom's initial analysis of

15    the data that he imaged revealed large numbers of deleted files and "data

16    carved" files,[19] but that, as of the date of the First NE Report, Broom was not in a

17    position to determine whether any of the deleted or data carved files were

18    relevant to the subject matter of the Action.

19          In the Second NE Report, Broom makes several observations that are

20    worthy of note:

21

22    [16] According to "Plaintiff's Notice of Defendant Baker's Non-Compliance with the Court's September 6, 2018
      Order" [docket no. 409], Murtagh sent Baker proof that he had paid Broom $22,870 on January 22, 2019, but Baker
      has failed to reimburse Murtagh for this payment.

23    [17] Baruch Cohen filed a Substitution of Attorney with the Court on September 13, 2018 [docket no. 384], replacing
      himself as counsel for Baker with Baker, acting in propia persona.  On September 23, 2018, Jessica Ponce

24    substituted in as counsel for Baker.  See Substitution of Attorney, docket no. 388.

25    [18] After forensically imaging the data on these devices, Broom returned all but one of the devices to Baker.  The one
      device not returned, a Dell XPS 1340 Laptop, Model PP17S, was instead turned over the Los Angeles Police

26    Department Internet Crimes Against Children Taskforce, as Broom discovered materials on that device that he
      considered to be contraband.  A criminal prosecution of Baker by the Los Angeles Police Department for child

27    pornography ensued and remains pending as of the date of this report and recommendation.  Counsel for Baker has
      advised that a plea agreement was reached in connection with this prosecution and that Baker is due to be sentenced

28    shortly in connection with this matter.
      [19] Broom explains in the First NE Report that "Data Carving" is the process used to recover files that have been
      previously deleted.

a. On September 7, 2018, less than 2 hours after Broom contacted Baker's counsel to discuss a turnover of Baker's Devices, Baker ran an encryption application (True Crypt) on one of the devices[20] later turned over to Broom (Device AA3[21]), accessing directories that included ones named "Pardo" (who has previously been identified as a witness in the Action) and "Murtagh hush."

b. The following day, on September 8, 2018, Baker again ran the encryption application on Device AA3:  he connected to an encrypted volume labelled "O" and accessed several files (including one entitled, "Message Source"); and connected to a volume labelled "E:" from which he accessed directories named "Discovery," "goons," "batcave," "Pardo," and "Brown[22] Pardo etc. email."  Broom was unable to locate the directories "batcave" and "Brown Pardo etc email" on any of the devices that Baker turned over to him.  As Broom explains on page 31 of the Second NE Report, "This is concerning because the directory 'batcave' contains security and encryption files, while the directory 'Brown Pardo etc email' contains 'Pardo' and 'Murtagh hush' files."

c. Three days later, on September 11, 2018, Baker connected a backup drive (Device AC) to Device AA3 and copied files (including 335GB of video files) from Device AA3 to Device AC. According to the Neutral Expert, "Any data that had been

---

[20] According to page 30 of the Second NE Report, "On Device AA3, TrueCrypt was installed on July 1, 2018 and run on the following dates:  September 7, September 8, September 11, and September 18, 2018 for a total of 7 runs."
[21] Broom assigned a designation to each device given to him by Baker.  A list of the devices and the designations given each device appears on page 2 of the First NE Report.  The same list appears on page 12 of this Court's February 19, 2019 Order to Show Cause re Contempt, docket no. 413, Exhibit 19 hereto.
[22] Brown has also been identified as a witness in the Action.

previously stored on Device AC (and then deleted), would have been permanently destroyed by copying the huge video files onto Device AC, by overwriting the old data with the new video files."

d. Later that same day, September 11, 2018, Baker reformatted Device AC. According to the Neutral Expert, "Reformatting a hard drive prepares the drive to hold new data by creating a new file system on the drive. This process destroys the previous data that was on the drive. Again, shortly after copying 335 GB of video files onto Device AC (destroying the data previously there), Baker then destroyed the new video files by reformatting the hard drive."

e. Lastly on September 11, 2018, Baker copied backup files from Device AH onto Device AC. The Neutral Expert reports that, "This activity is consistent with someone attempting to generate worthless data to thwart a forensic examination . . . . "

f. Baker deleted large numbers of files after the entry of orders from this Court prohibiting such activity and requiring the turnover of that data to the Neutral Expert, many of which appear relevant to the subject matter of the Action. A list of these deleted files and the corresponding deletion dates appears on pages 3 through 9 of the Second NE Report.

g. Baker has not provided the password and instructions to access the encrypted file "Birthday 2.wmv," located on three of Baker's devices, despite Broom's request for this information.[23] See

---

[23] In multiple declarations filed later with the Court, Baker claims to be unable to recall the password or encryption key necessary to access this file. Broom notes further, on page 29 of the Second NE Report, that, although this file bears the extension "wmv," which is the standard file extension for a Windows Media Video file and Baker has placed this file in the directory, "Users/Baker/Videos," this file is NOT a Windows Media Video file. Broom concludes that, by naming the file with this extension and placing it in a directory of video files, "Baker was

Second NE Report, p. 30, for a recitation of the discussions between Broom and Baker on this subject.

h.  "Baker was running the TrueCrypt application as late as the day he turned his devices over to the Neutral Expert, yet he now states that he cannot remember the password." Second NE Report, p. 30.

i.  Baker has not provided the Neutral Expert with multiple USB devices that have been used on Baker's Devices.

j.  Baker installed another encryption program named "Axcrypt" on Device AA3 ON May 5, 2018.  Baker ran Axcrypt on Device AA3 on September 12, September 13, September 14, September 15 and September 17, 2018, for a total of 30 runs.  Baker ran Axcrypt on Device AH on September 17, 2018.  Baker did not provide a list of the files that he encrypted with this program and has not provided the Neutral Expert with the password necessary to unlock these files.

k.  Baker used a portable and secure operating system on a USB drive named "Qubes."  The USB drive was used on Devices AH, AB and AG.  Baker did not give Broom any device that had the Qubes operating system on it.

6.  **The February 19, 2019 OSC**

Based on Baker's failure to comply with earlier orders of the Court and the troubling findings made by the Neutral Expert in the Second NE Report, following the January 8, 2019 hearing, the Court issued its February 19, 2019 "Order to Show Cause re Contempt" [Docket no. 413], attached hereto as Exhibit 19 (the "February 2019 OSC").  Paragraph 10 of that order, which appears on pages 10

---

attempting to hide the file from detection." Second NE Report, p. 29.  Page 29 of the Second NE Report also explains the basis for Broom's conclusion that the file Birthday2.wmv is a TrueCrypt Encrypted Volume.

through 11 thereof, details the findings the Court had previously made as to Baker's violations of this Court's orders.[24]  Paragraph 1 of the February 2019 OSC directs Baker to appear on April 2, 2019 at 10:00 a.m.[25] to show cause why the Court should not do the following based on Baker's noncompliance with Court orders (collectively, the "Additional Steps"):

      a. hold Baker in civil contempt for having failed to comply with prior orders of the Court; issue a warrant for his arrest; and direct that Baker be incarcerated until he performs the "Affirmative Acts" set forth in paragraph 8 of the February 2019 OSC;[26]

      b. make a criminal referral to the U.S. Attorney based on, among other things, Baker's spoliation of evidence;

      c. make the "Additional Findings" detailed in paragraph 11 of the February 2019 OSC;[27]

      d. Issue a report and recommendation to the District Court that Baker be held in criminal contempt and incarcerated for a period of not less than 90 days; an

      e. Strike Baker's answer to complaint and enter judgment for Murtagh for damages and injunctive relief.

Paragraph 2 of the February 2019 OSC directs Baker to file and serve any written response to the February 2019 OSC not later than March 19, 2019 and to

---

[24] The "Declaration of Robert Rosen, Esq. in Support of Plaintiff's Status Report" [docket no. 400], filed January 4, 2019, also contains a listing of respects in which Baker has failed to comply with orders of this Court.

[25] Plaintiff also noticed a hearing for April 2, 2019 on his motion for an order directing the Neutral Expert to turnover to plaintiff's cyber expert, Anderson, all data that he has received from Baker.  The Court granted that motion by order entered April 23, 2019 [docket no. 464].  The Court's April 23 order contained provisions designed to protect former clients of Baker from having privileged materials delivered to Anderson.  The Court provided additional protections for third parties claiming a privilege with regard to the information obtained from Baker in its June 12, 2019 order supplementing the April 23 order [docket no. 500].  As a result of these third-party privilege issues, data that the Neutral Expert obtained from Baker has not yet been turned over to Anderson.

[26] Paragraph 9 of the February 2019 OSC sets forth the information that Baker should include in the Baker Declaration if he claims to be unable to perform any of the Affirmative Acts.

[27] The proposed findings set forth in paragraph 11 of the February 2019 OSC track closely the findings of the Neutral Expert in the Second NE Report and include the observations outlined above in Section 5 on pages 19 through 21.

include in his response the declaration described in paragraph 7 of the order (the "Baker Declaration"). The Baker Declaration, as described in paragraph 7, is Baker's own declaration under penalty of perjury setting forth, among other things:

    i.    each deletion of data or change in access information or credentials that has taken place with regard to Baker's Data or Baker's Devices from and after certain dates;

    ii.    all steps that Baker has taken in an effort to locate backups or copies of any deleted data;

    iii.    the names and contact information for custodians of any such backup copies;

    iv.    why he had not paid the $132,633.25 sanction award;

    v.    the source of funds used to pay prior sanction awards; and

    vi.    all efforts he had made to locate or obtain funds with which to pay the monetary sanctions imposed by the Court.

Instead of filing the declaration required by the terms of the February 2019 OSC, Baker's counsel filed a brief memorandum of points and authorities and her own declaration authenticating an email she sent to Murtagh's counsel passing along hearsay statements from Baker concerning some of the information that should have been included in the Baker Declaration. [See Declaration of J. Ponce, filed March 19, 2019, Docket No. 423-1, attached hereto as Exhibit 20.] Baker offered no other evidence in a timely manner in response to the February 2019 OSC and made no attempt at any time to refute any of the observations made by the Neutral Expert in the Second NE Report.

At the April 2, 2019 hearing on the February 2019 OSC, the Court struck the email attached to Ms. Ponce's declaration as hearsay and found that Baker had failed to show cause why the Court should not take the Additional Steps. However, in light of the drastic nature of some of the Additional Steps, the Court

agreed to review and consider (i) the declaration that Baker had belatedly filed on the morning of the April 2 hearing, (ii) any additional declaration(s) that Baker might file on or before April 9, 2019 and (iii) any response to these declarations that Murtagh might file by April 16, 2019, before entering an order in response to the February 2019 OSC.

After reviewing the declarations that Baker filed on April 2, 2019 [Docket No. 442] and April 9, 2019 [Docket No. 453] and Murtagh's response thereto [Docket No. 462], the Court remained of the view that there was cause for it to take the Additional Steps and entered its April 24, 2019 order holding Baker in civil contempt [Docket No. 466], attached hereto as Exhibit 21 (the "Civil Contempt Order").

### 7. Baker's Arrest and Release; The Second Criminal Referral

In the Civil Contempt Order, the Court held Baker in civil contempt for reasons detailed on pages 6 through 7 of that order and directed that Baker be remanded to the custody of the United States Marshal's Service of the Central District of California and detained until he had purged his contempt by completing the "Required Affirmative Acts" defined in paragraph 2 of that order (other than any of the Required Affirmative Acts that he proved "categorically and in detail" he was unable to perform).  The Court also made the Additional Findings in the Civil Contempt Order and stated that it would refer Baker to the United States Attorney for criminal prosecution for the spoliation of evidence.[28]  The Court scheduled a status conference on Baker's performance of the Required Affirmative Acts for June 11, 2019 at 10:00 a.m.

The United States Marshal's Service arrested Baker on May 1, 2019 and brought him to bankruptcy court for a status conference at 2:00 p.m. that day.  It appearing to the Court that it would be difficult to make the arrangements

---

[28] Attached hereto as Exhibit 22 is a copy (without exhibits) of this Court's second referral to the U.S. Attorney's office concerning Baker's conduct [Docket No. 503].

1    necessary to have Baker released from federal custody in time for him to appear

2    in state criminal court on May 13, 2019 for a preliminary hearing on his child

3    pornography charges,[29] the Court agreed to release Baker from custody and

4    gave him until May 9, 2019 to file and serve a declaration attesting to his having

5    performed each of the Required Affirmative Acts by that date.  (The Court

6    advised that it would issue a new warrant for Baker's arrest if he failed to file the

7    foregoing declaration in a timely manner or failed to complete any of the

8    Required Affirmative Acts by May 9, 2019.)  See "Order After Status Conference on

9    Civil Contempt" [Docket No. 479] attached hereto as Exhibit 23.

10           The Court entered an order on May 10, 2019 [docket no. 490] (the "May

11   10 Order"), a copy of which is attached hereto as Exhibit 24, setting forth its

12   findings after having reviewed Baker's May 9, 2019 declaration [docket no. 486]

13   and Murtagh's response thereto [docket no. 489].  As the May 10 Order explains,

14   although the Court did not find Baker's testimony as to his inability to perform

15   certain of the Required Affirmative Acts to be credible: "In the context of civil

16   contempt, incarceration may be used only to coerce a party to take a particular

17   action.  It may not be used to punish a party for having failed to take a particular

18   action."  May 10 Order, at ¶ 9. "Although this Court has no doubt that Baker has

19   disregarded repeated orders of this Court and remains in contempt of this Court,

20   this Court has no reason to believe that continued incarceration of Baker will

21   result in an increased level of cooperation from Baker."  May 10 Order, at ¶10.

22           As a result, the Court elected not to issue a new warrant for Baker's arrest

23   at this time and, instead, scheduled a further hearing for June 11, 2019 at 10:00

24   a.m., at which time Baker was to show cause why the Court should not (a) strike

25   his answer to complaint and enter judgment for the plaintiff and (b) issue a report

26   and recommendation that the District Court hold Baker in criminal contempt.

27   Baker's written response to the May 10 Order was due by May 28, 2019.

28

---

[29] See supra, note 16.

1        Baker filed a supplemental declaration regarding the Required Affirmative

2    Acts on May 28, 2019.  Only one paragraph of that declaration was responsive to

3    the May 10 Order to show cause -- paragraph 11 – in which Baker explained that

4    he should not be incarcerated because he is his elderly mother's full time

5    caregiver.[30]  Finding that Baker had failed to show cause why the Court should

6    not take these additional steps, after the June 11, 2019 hearing on the May 10

7    Order, the Court entered its June 12, 2019 order [docket no. 501], a copy of

8    which is attached hereto as Exhibit 25.  In this order, the Court struck Baker's

9    answer to complaint and authorized Murtagh to proceed by way of default[31] and

10   agreed to issue the instant report and recommendation.

11   II

12   **RECOMMENDATION**

13       After Baker was ordered to give plaintiff's expert access to all the same electronic

14   data that he had given to his own expert, Baker deleted large amounts of that data and

15   changed passwords or user names so that plaintiff's expert could not access this

16   information.  After Baker was ordered to turnover electronic data and devices to the

17   Neutral Expert and not to alter, destroy, encrypt or overwrite that data, he encrypted,

18   overwrote and destroyed large amounts of data and turned over only a portion of his

19   devices to the Neutral Expert.

20       When held in civil contempt and incarcerated for this behavior, Baker responded

21   by submitting declaration after declaration swearing under penalty of perjury that he

22   could not remember the passwords or encryption keys necessary to unencrypt the data,

23   had no known backups and could not restore any data that had been deleted.  When

24   the Court imposed monetary sanctions, Baker submitted multiple declarations swearing

25   under penalty of perjury that his only income is the pension he receives as a retired

26

27   [30] This testimony is contradicted by earlier testimony offered by Baker to the effect that his mother has another

28   caregiver who comes in for a few hours a day and that Baker's girlfriend also lives in the household with his mother. (Baker claims that his girlfriend is elderly as well and cannot provide the required care for his mother.)
[31] The Court set a deadline of September 10, 2019 for Murtagh to file and serve a motion for default judgment.

1  LAPD officer – all of which he spends each month for basic living expenses – and that

2  he does not have, and will not be able to obtain, the funds with which to pay any portion

3  of the monetary sanctions that the Court has imposed upon him.

4         According to Baker's own testimony, it is now impossible for him to undo the

5  harm that he has caused.  Baker claims he cannot restore data that has been deleted,

6  cannot unlock files that have been encrypted and cannot compensate the other side for

7  the costs that it has incurred because of his conduct. Therefore, if Baker's declarations

8  are to be believed, continued reliance on coercive contempt sanctions is futile.  Yet

9  Baker cannot be permitted to violate order after order of this Court with impunity and

10  should not be excused from further sanction simply because, by his own actions, he has

11  rendered himself incapable of complying with court orders.

12

13         In accordance with 28 U.S.C. § 157(a), the District Court has issued a standing

14  order generally referring all cases under title 11 and all proceedings arising under,

15  arising in or related to cases under title 11 to the bankruptcy judges for the Central

16  District of California.  The District Court is authorized by 28 U.S.C. § 157(d) to withdraw,

17  in whole or in part, the reference as to any case or controversy "for cause shown."  See

18  Fed. R. Bankr. P. 5011(a) and 9033.  This Court respectfully submits that the foregoing

19  facts, coupled with this Court's lack of authority to hear and determine criminal contempt

20  matters, constitute sufficient cause within the meaning of this section for the District

21  Court to withdraw the reference to the extent set forth below.  Accordingly, the Court

22  recommends:

23         1.  that the District Court sua sponte withdraw, in part, the reference pursuant

24             to 28 U.S.C. § 157(d) for the limited purpose of considering criminal

25             contempt proceedings against defendant Clark Warren Baker; and

26         2.  that the District Court find Clark Warren Baker guilty of criminal contempt

27             and sentence him to be incarcerated for a period of 90 days or such other

28             period as the District Court may deem appropriate.

# # #

Date: June 27, 2019

Sheri Bluebond
United States Bankruptcy Judge